Andrew G. Deiss (USB 7184)
Wesley D. Felix (USB 6539)
John Robinson Jr. (USB 15247)
DEISS LAW P.C.
10 West 100 South, Suite 425
Salt Lake City, UT 84101
Tel: (801) 433-0226
adeiss@deisslaw.com
wfelix@deisslaw.com
jrobinson@deisslaw.com

David R. Jordan (*Pro Hac Vice Pending*)
THE LAW OFFICES OF DAVID R. JORDAN, P.C.
PO Box 840
Gallup, NM 87305
(505) 863-2205
Djlaw919@gmail.com

*Counsel for B. N.*

<table>
<tr><td colspan="2" align="center"><b>UNITED STATES DISTRICT COURT<br>DISTRICT OF UTAH (CENTRAL)</b></td></tr>
</table>

| | |
|---|---|
| **CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS**, a Utah corporation, **LDS FAMILY SERVICES**, a Utah corporation,<br><br>                                Plaintiffs,<br><br>v.<br><br>**B.N.**, an individual,<br><br>                                Defendant. | **MOTION TO DISMISS**<br><br>Case No. 2:19-cv-00062-CW-EJF<br><br>Judge Clark Waddoups<br>Magistrate Judge Evelyn J. Furse |

Pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, Defendant B.N. moves to dismiss this case.

This case involves a massive, decades-long solicitation of Navajo children to be placed in non-Navajo foster homes, off of the Navajo Nation, while Plaintiffs had actual knowledge that a significant percentage of the solicited children were in danger of abuse. For decades, Plaintiffs engaged in a targeted recruitment, and selection process within the boundaries of the Navajo Nation to Navajo children in Plaintiffs' Indian Student Placement Program (the "Placement Program"). Defendant intends to prove at trial on the merits of this case that this targeted recruitment occurred with actual knowledge that a significant percentage of the children were being abused while enrolled in the Placement Program.

This present controversy in Utah District Court, however, does not address the merits of the case.[1] Instead, it addresses the question of jurisdiction, exhaustion and settlement. The Navajo Nation has jurisdiction because the vast majority of the soliciting activity, the activity that should have included warnings about the inherent dangers of the program, happened on the Navajo Nation. Navajo children, including Defendant, were baptized at LDS Chapels located within the Navajo Nation. Furthermore, decisions relating to placement were made primarily from the Navajo Nation by case workers who would come onto the Navajo Nation to interview parents and students.

---

[1] The parties entered into a stipulated protective order that limited all discovery to jurisdictional facts. Any discovery toward the merits of the case was stayed until the jurisdictional dispute was resolved.

## Statement of Facts

1.    The Defendant took the deposition of the Plaintiffs pursuant to Rule 30(b)(4) of the Navajo Rules of Civil Procedure. This is the equivalent of Federal Rule 30(b)(6). Plaintiffs produced Harold Call Brown, who was Commissioner of LDS Family Services[2] from 1976-1981 and 1985-1996.[3]

2.    The Placement Program was carried out through ecclesiastical missions that served the Indians and stakes found in the Navajo Nation.

3.    Branch Presidents on the Navajo Nation would determine the ages of the children participating in the Placement Program in the 1960's and 70's and ensure the children were eight years old.

4.    Branch Presidents on the Navajo Nation were involved in teaching and baptizing the children.

5.    Navajo parents would receive applications for their children to participate in the Placement Program from the Branch President or Missionaries on the Navajo Nation.

6.    There were at least two "Lamanite Seminary Coordinators" on the Navajo Nation in the 1960's and 1970's.

---

[2]  LDS Family Services was formerly known as LDS Social Services.

[3] The testimony of Harold Call Brown is binding on the Plaintiffs. Rule 30(b)(4), Nav.R.Civ.P.; *A & E Prod. Grp., L.P. v. Mainetti USA Inc.*, No. 01 CIV. 10820 (RPP), 2004 WL 345841, at *6 (S.D.N.Y. Feb. 25, 2004); Rule 26(24), Nav.R.Evid.; *see also Sabre v. First Dominion Capital, LLC,* 2001 WL 1590544, at *1, 2001 U.S. Dist. LEXIS 20637, at *2 (S.D.N.Y. Dec. 12, 2001) ("A 30(b)(6) witness testifies as a representative of the entity, his answers bind the entity and he is responsible for providing all the relevant information known or reasonably available to the entity.").

7.   Seminary Coordinators taught seminary classes on the Navajo Nation, trained teachers to teach seminary on the Navajo Nation and counseled with mission and stake members regarding children potentially eligible for the Placement Program.

8.   Service contacts with Navajo students were made in counseling sessions either at school or at home on the Navajo Nation.

9.   Agents of the Plaintiffs, referred to in their literature as "ecclesiastical units", explained the Student Placement Program to tribal members on the Navajo Nation and were directed to "encourage students to participate as they indicate a desire to do so."

10.   Navajo Ecclesiastical Leaders with the Navajo Nation recommended students to participate in the Program and helped with the application process on the Navajo Nation.

11.   Navajo LDS leaders and volunteer leaders, such as branch presidents, served as intermediaries between program personnel, natural parents and Navajo Nation personnel.

12.   Ecclesiastical Leaders of the LDS Church assisted caseworkers in setting up meetings with students and the students' families on the Navajo Nation at least one time during the summer.

13.   Seminary coordinators and professional teachers were to keep in contact with the Bureau of Indian Affairs and tribal leaders regarding the Placement Program.

14.   While Commissioner of LDS Family Services from 1976-1981 and 1985-1996, Mr. Harold Call Brown, Plaintiffs' 30(b)(4) representative, was involved with the Placement Program and visited the Navajo Nation eight to ten times to visit with the students' families and caseworkers and church leaders.

15.   Caseworkers for the students would go to the Navajo Nation during the school year and summer to provide the families with information about their children and take information back to the children from their families.

16.   LDS priesthood leaders on the Navajo Nation were expected to encourage Navajo students to participate in the Placement Program.

17.   Applications for the Placement Program were submitted under the direction of the bishop or branch president of the Navajo child's natural family. This meant a branch president on the Navajo Nation.

18.   Applications for the Indian Student Placement Program would often be given out by LDS missionaries to the Navajo parents, or the parents could go to their Branch President for an application.

19.   Bishops and/or Branch President(s) had duties and were charged with providing services on the Navajo Nation, pursuant to procedures described in the *LDS Social Services Policy and Procedure Manual.*

20.   A Navajo student's application would be sent to the LDS Family Services office/steward agency located on the Navajo Nation.

21.   A steward agency was located on the Navajo Nation during the 1960's and 1970's in Chinle, AZ and was staffed with a secretary and agency practitioners/caseworkers during the school year and summer.

22.   Agency practitioners interviewed the Navajo students and their families on the Navajo Nation at the family home or at the steward agency on the Navajo Nation.

23.   Agency practitioners held Navajo student selection meetings with the Bishop or Branch President on the Navajo Nation where the Branch met or in the agency office on the Navajo Nation. The Navajo student would also need to be baptized before they came into the program.

24.   A placing agency practitioner, a caseworker from Utah, would travel from Utah to the Navajo Nation to meet with the Navajo student and the student's family for a field visit in the summer.

25.   An agency practitioner was on the Navajo Nation full-time and a placing agency practitioner was primarily in Utah with periodic visits to the Navajo Nation.

26.   LDS Social Services rented buses that transported Navajo students from the Navajo Nation to Utah.

27.   It was the Plaintiffs' policy to have adults on the bus from the Navajo Nation to Utah. A case worker or foster family would ride on the bus from the Navajo Nation to Utah to help supervise.

28.   The students leaving for Utah met the bus at an LDS church on the Navajo Nation.

29.   Mr. Brown was on the Navajo Nation and involved with getting students loaded on the bus. He also served as a chaperone on the bus.

30.   Some bus chaperones were also Navajo LDS members.

31.   Occasionally, baptisms were performed on children under eight on the Navajo Nation.

32.   Students in the Placement Program in the 1960's were given a "Student Guide" for the "LDS Indian Student Placement Program", dated June of 1968 that provided information about the program. This "Student Guide" was given to the child by someone on the Navajo Nation or by someone when the child arrived in Utah.

33.   This "Student Guide" instructed Navajo students on what to do while back home on the Navajo Nation. Students were instructed to go to church, help family and friends become better members of the church, live church standards, and tell friends and relatives about the Placement Program.

34.   Students were instructed to talk to their friends and family within the Navajo Nation about the program during the student's summer break. The children were instructed to tell other Navajo children that it is an "enjoyable challenge to be on the Program."

35.   It was the policy and procedure of LDS Social Services to have social workers visit students and the students' families at least one time during the summer in the student's home on the Navajo Nation.

36.   Caseworkers spoke to the students and students' families about plans for the next school year and activities for the summer on the Navajo Nation.

37.   The Placement Program was a year-round program and as part of the program, Navajo students and their families were expected to attend LDS churches on the Navajo Nation during the summer.

38.   Children were required to be baptized before they could participate in the program and George P. Lee, as a mission president, was charged with training missionaries to teach and baptize the Navajo students.

39.   Missionaries provided applications to families and helped families fill out the applications.

40.   Missionaries had a document with a picture of George P. Lee that was given to parents on the Navajo Nation to help explain and describe the Placement Program.

41.   Families filled out the applications to participate in the Placement Program while physically located on the Navajo Nation.

42.   Natural family interviews, as part of the application process for Navajo children, would take place on the Navajo Nation.

43.   Missionaries, case workers or Branch Presidents would use a flip chart presentation to explain the program to natural families. Missionaries would use the chart in the homes of students on the Navajo Nation.

44.   It has been stipulated by the Counsel for the Plaintiffs that missionaries were on the Navajo Nation teaching about the LDS Church.

45.   Originally, preparation and orientation work on the Navajo Nation was conducted by placement program staff members (agency practitioners/caseworkers) and missionaries.

46.   In 1971, local LDS priesthood leaders on the Navajo Nation began to assume responsibility for Navajo student applications and orientation on the Navajo Nation.

47.   Natural families on the Navajo Nation could contact their Branch President to get information regarding their student in the program.

48.   Caseworkers from Utah would travel and visit the natural family on the Navajo Nation three separate times, in the fall, spring and summer. Fall and spring visits were to take information to the

family about their student and get information to take back to the student. Summer visits were to see if the student was coming back to the program.

49.   Before kids were loaded on the bus to travel from the Navajo Nation to Utah, caseworkers had traveled to the Navajo Nation to interview students to determine where and with whom the student would be placed.

50.   In August of 1964, Defendant was loaded on a bus on the Navajo Nation and shipped to Utah for her fifth-grade school year. She was taken back to the Navajo Nation for summer break. *Defendant's Complaint* ¶ 3, Exhibit A to Complaint, Dkt. No. 2.

51.   In August of 1965, Defendant was loaded on a bus on the Navajo Nation and shipped to a home in River Heights, Utah. She was returned home to the Navajo Nation following the school year. *Defendant's Complaint* ¶ 14, Exhibit A to Complaint, Dkt. No. 2.

52.   In August of 1966, Defendant was again loaded on a bus on the Navajo Nation, shipped to Utah and returned to her home on the Navajo Nation following the school year. *Defendant's Complaint* ¶ 15, Exhibit A to Complaint, Dkt. No. 2.

53.   At the start of Defendant's senior year of high school, she was loaded on a bus on the Navajo Nation and shipped to a home in Orem, Utah and returned to her home on the Navajo Nation following the school year. *Defendant's Complaint* ¶ 16, Exhibit A to Complaint, Dkt. No. 2.

54.   On May 31, 2016, Defendant filed a complaint in Navajo District Court alleging that she had been abused while in the Placement Program. *Defendant's Complaint*, Exhibit A to Complaint, Dkt. No. 2.

55.     Plaintiffs filed an action seeking an injunction in the United States District Court for the District of Utah, Central Division. The District Court in Utah declined to issue the injunction citing among other things, the failure of the Plaintiffs to exhaust tribal remedies and that at this stage in litigation the complaint must be taken as true. Memorandum Decision and Order, 2:16-cv-00453-RJS, Dkt. No. 40.

56.     On May 25, 2018, the Navajo Nation District Court denied Plaintiff's motion to dismiss ruling that the Navajo Nation had jurisdiction over this dispute.

57.     On December 28, 2018, the Navajo Supreme Court denied Plaintiff's writ of prohibition. The Court declined to reach the issue of jurisdiction finding that Plaintiffs had not satisfied the standards for obtaining a writ of prohibition in the Navajo Supreme Court and finding that the record had not been fully developed in the Navajo District Court, and that Plaintiff's had not satisfied the standard for a writ of prohibition under Navajo law. *Corporation of the President of the Church of Jesus Christ of Latter-Day Saints, a Utah Corporation v. Window Rock District Court*, No. SC-CV-42-18, slip op. (Nav. Sup. Ct. December 28, 2018).

**Argument**

I.      *The Navajo Nation Has Exclusive Jurisdiction Over This Dispute Because It Falls Within The Adjudicatory Power of the Navajo People Under the Treaty of 1868.*

All analysis of Navajo jurisdiction should begin with the Treaty of 1868. This treaty constitutes the United States formal recognition of Navajo sovereignty. The Treaty of 1868, like all treaties with the United States, is to be treated as the supreme law of the land, binding every state under Article VI of the U.S. Constitution.

10

Article II of the Treaty defines the Navajo Nation's boundaries and contains an "exclusion"

clause:

> [T]he United States agrees that no persons except those herein so authorized to do, and except such officers, soldiers, agents, and employe[e]s of the government, or of the Indians, as may be authorized to enter upon Indian Navajo Nations in discharge of duties imposed by law, or the orders of the President, shall ever be permitted to pass over, settle upon, or reside in, the territory described in this article.

*Donovan* v. *Navajo Forest Products Industries*, 692 F.2d 709, 711-12 (10th Cir. 1982) helps clarify the

language set forth in Article II by stating, "in order to achieve an end to conflict and ensure peace, the

United States Government agreed to leave the Navajo alone on their Navajo Nations to conduct their

own affairs with a minimum of interference of non-Indians, and then only by those expressly authorized

to enter upon the Navajo Nation."

Article II recognizes the Navajo Nation's authority to exclude and therefore regulate non-Indian

entities on trust land. *Window Rock Unified School District* v. *Reeves*, 861 F.3d 894, 904–05 (9th Cir.

2017), *as amended* (Aug. 3, 2017), *cert. denied,* 138 S. Ct. 648, 199 L. Ed. 2d 586 (2018). The Ninth

Circuit ruled "as the treaty makes clear, the land at issue here is 'within the exclusive sovereignty of the

Navajos,' and from this sovereignty, regulatory and adjudicative authority follow." *Reeves*, 861 F.3d at

904–05.

*Reeves* followed the binding precedent of the United States Supreme Court, which firmly

established that the right to exclude establishes adjudicatory jurisdiction.

> This power [to exclude] necessarily includes the lesser power to place conditions on entry, on continued presence, or on Navajo Nation conduct, such as a tax on business activities conducted on the Navajo Nation. When a tribe grants a non-Indian the right

> to be on Indian land, the tribe agrees not to exercise its ultimate power to oust the non-Indian as long as the non-Indian complies with the initial conditions of entry. However, it does not follow that the lawful property right to be on Indian land also immunizes the non-Indian from the tribe's exercise of its lesser-included power to tax or to place other conditions on the non-Indian's conduct or continued presence on the Navajo Nation.

*Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 144–45, 102 S. Ct. 894, 905, 71 L. Ed. 2d 21 (1982).

The Navajo Nation conditioned its permission to enter the its boundaries upon Petitioner's agreement to engage in lawful activity. It reserves the right to exclude them based upon unlawful activity. In fact, Navajo exclusion rules specifically provide for exclusion based upon "a finding that such person has engaged in any of the following acts or conduct:. . . Removal from the Navajo Nation of any member of the Tribe under the age of 18, or under guardianship, except by Court order of a Court of the Navajo Nation or in conjunction with a nonsectarian program administered by the Navajo Nation or the Bureau of Indian Affairs." Rule 3, *Navajo Rules for Exclusionary Proceedings*. This provision demonstrates that the Navajo Nation takes the removal of children from its borders very seriously. When Plaintiffs removed children from the Navajo Nation, even with the permission of the parents, they should expect strict scrutiny of their actions.

The actions taken by the Plaintiffs while present on and within the boundaries of the Navajo Nation are properly within Navajo adjudicatory jurisdiction.

II.  **The Montana Exceptions Do Not Apply To The Navajo Nation's Exercise Of Treaty Powers, Including The Power To Exclude.**

In *Montana*, the U.S. Supreme Court dealt with a treaty Navajo Nation with language similar to the Navajo Treaty of 1868. There was an important difference between *Montana* and the present case,

however. *Montana* dealt with the rights to a riverbed. The Court observed: "But because control over the property underlying navigable waters is so strongly identified with the sovereign power of government, it will not be held that the United States has conveyed such land except because of 'some international duty or public exigency.'" *Montana*, 450 U.S. at 552. The treaties at issue in *Montana* "fail[ed] to overcome the established presumption that the beds of navigable waters remain in trust for future States and pass to the new States when they assume sovereignty." 450 U.S. at 553.

Faced with a situation where the treaties "nowhere suggested that Congress intended to grant authority to the Crow Tribe to regulate hunting and fishing by nonmembers on nonmember lands", 450 U.S. at 558, the Supreme Court turned to the issue of the Crow Tribe's inherent sovereignty. It was in discussing the Tribe's inherent sovereignty that the Court fashioned the now-famous two-tiered test:

> Non-Indian hunters and fishermen on non-Indian fee land do not enter any agreements or dealings with the Crow Tribe so as to subject themselves to tribal civil jurisdiction. And nothing in this case suggests that such non-Indian hunting and fishing so threaten the Tribe's political or economic security as to justify tribal regulation.

450 U.S. at 566. This test has no applicability if, as in the present case, the right to regulate came directly out of the treaty.

Tribal authority over the activities of non-Indians on Navajo Nation lands is an important part of tribal sovereignty. *See Montana,* 450 U.S. at 565–566; *Washington v. Confederated Tribes of Colville Indian Navajo Nation,* 447 U.S. 134, 152–153, 100 S.Ct. 2069, 2080–2081, 65 L.Ed.2d 10 (1980); *Fisher v. Dist. Court of Sixteenth Judicial Dist. of Montana, in & for Rosebud Cty.*, 424 U.S. 382, 387, 96 S. Ct. 943, 946, 47 L. Ed. 2d 106 (1976). Civil jurisdiction over such activities presumptively lies in the tribal courts

unless affirmatively limited by a specific treaty provision or federal statute. *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 18, 107 S. Ct. 971, 977–78, 94 L. Ed. 2d 10 (1987).

"Because the Tribe retains all inherent attributes of sovereignty that have not been divested by the Federal Government, the proper inference from silence ... is that the sovereign power ... remains intact." *Merrion,* 455 U.S. at 149, n. 14. See also *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 60, 98 S. Ct. 1670, 1678, 56 L. Ed. 2d 106 (1978) ("[A] proper respect both for tribal sovereignty itself and for the plenary authority of Congress in this area cautions that we tread lightly in the absence of clear indications of legislative intent."). Since neither the wording of *Montana*, nor the subsequent actions of Congress, have limited the Navajo Nation's ability to protect its children, the sovereign power to regulate the taking of children off of the Navajo Nation remains intact, and does not need to be justified by *Montana* exceptions.

### III.   *The Protection Of Navajo Children Is An Inherent Power Of Tribal Self-Governance.*

Beyond treaty powers, Indian tribes retain inherent powers. *Montana*, 450 U.S. at 564. This includes the power to protect its children. In fact, Congress has expressly recognized that that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children. 25 U.S.C. § 1901(3).

The second exception recognized in *Montana* allows the Navajo Nation to protect the welfare of the tribe:

A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its Navajo Nation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

14

*Montana,* 450 U.S. at 566. The actions, conduct and activities of the Plaintiffs had a direct effect on the health and welfare of the Navajo Nation. As alleged in Defendant's Complaint, children from the Navajo Nation began to be placed in the Placement Program as early as 1946. *See Complaint* at ¶ 8, Dkt. No. 2. This program continued for over forty years, ending in approximately 1990, with many tens of thousands of Navajo Nation children having been placed in foster care with non-member families off of the Navajo Nation. *Id.*

When Congress enacted the Indian Child Welfare Act, it recognized that tribal children were not only "vital to the continued existence and integrity of Indian tribes", but that this continued existence and integrity was threatened by placing such children in non-member foster homes. 25 U.S.C. § 1901(4). Before enacting the ICWA, Honorable Morris K. Udall, a representative from Arizona, introduced the bill as follows:

> ***The wholesale separation of Indian children from their families is perhaps the most tragic and destructive aspect of American Indian life today.*** Surveys of states with large Indian populations conducted by the Association of American Indian Affairs (AAIA) in 1969 and again in 1974 indicate that approximately 25-35 percent of all Indian children are separated from their families and placed in foster homes, adoptive homes, or institutions. In some states the problem is getting worse: in Minnesota, one in every eight Indian children under 18 years of age is living in an adoptive home; and, in 1971-72, nearly one in every four Indian children under 1 year of age was adopted.

H.R. REP. 95-1386, 9, 1978 U.S.C.C.A.N. 7530, 7531 (emphasis added).

These findings led to the adoption of a federal statutory scheme requiring tribal involvement in foster placements. ***For the purpose of this case, however, the importance is that Congress has already concluded that protection of Navajo children in the context of foster care situations directly affects the***

_**health or welfare of the tribe**_. In fact, Congress, more than a decade after Defendant was put into the foster care of Plaintiffs, described the situation as an "Indian child welfare crisis is of massive proportions". H.R. REP. 95-1386, 9, 1978 U.S.C.C.A.N. 7530, 7532.

It is hard to imagine anything more vital to the welfare of the Navajo people than the protection of their children. This protection is a part of the inherent power of the tribe. As the Supreme Court of Alaska has observed:

> "Indian tribes retain those fundamental attributes of sovereignty ... which have not been divested by Congress or by necessary implication of the tribe's dependent status" … Congress [made an] express finding in ICWA that "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children… Congress mandates that states respect a tribe's vital and sovereign interests in its children.

_Simmonds v. Parks_, 329 P.3d 995, 1007 (Alaska 2014).

The Navajo Nation maintains, as an inherent power, the power to protect its children from non-members who would enter its borders and solicit children to go into foster care without putting the necessary protections in place to ensure the safety of those children. Navajo Courts have jurisdiction.

IV.     _**The Nation's Consensual Relationship With Plaintiffs Gives Rise To Jurisdiction.**_

Plaintiffs entered into consensual relationships with the Navajo Nation and the families of the children placed in the Placement Program, by which it was agreed that the Plaintiffs would find suitable and safe foster homes for the children involved in the program while they were enrolled and away from their families. The first exception to _Montana_ states: "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its

members, through commercial dealing, contracts, leases, or other arrangements." *Montana*, 450 U.S. at 565.

A non-member may consent to tribal jurisdiction "expressly or by his actions". *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 337, 128 S. Ct. 2709, 2724, 171 L. Ed. 2d 457 (2008). There are two additional requirements when satisfying the first *Montana* exception: (1) the regulation imposed by the tribe must "have a nexus to the consensual relationship itself (*Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 656, 121 S. Ct. 1825, 1833, 149 L. Ed. 2d 889 (2001)); and (2) the "other arrangements" mentioned by the Supreme Court applies to "*private consensual* relationships". *Nevada v. Hicks*, 533 U.S. 353, 359, n. 3, 121 S. Ct. 2304, 2310, 150 L. Ed. 2d 398 (2001) (emphasis in original).

A private, consensual agreement existed between tribal members of the Navajo Nation, namely the parents of the children enrolled in the program, and the Plaintiffs, by which the Plaintiffs agreed to provide a safe, suitable foster home for the children while they were enrolled in the Placement Program. This arrangement was wholly private in nature; it was entered into between private tribal members and a private religious entity. Additionally, the arrangement at issue here is directly related to and forms the basis for the causes of action asserted by Plaintiffs.

As the Statement of Facts and the Deposition of Harold Brown, Plaintiffs' 30(b)(4) representative, shows, many of the decisions regarding the recruitment, selection, participation and placement of the children in the Placement Program were made by representatives of Plaintiffs within the boundaries of the Navajo Nation. For example. Branch Presidents on the Navajo Nation would

determine eligibility of the children for inclusion in the program, verifying ages and baptism. Statement of Facts, ¶ 3. Missionaries assigned to the Navajo Nation and Branch Presidents would teach and baptize the children in preparation for the program. Statement of Facts, ¶ 38. The Branch President or the Missionaries would provide applications for the program to interested parents. Statement of Facts, ¶ 5, 18. Seminary coordinators would leach classes on the Navajo Nation to the children preparing for placement. Statement of Facts, ¶ 6, 7. Ecclesiastical units on the Navajo Nation would explain the Placement Program to the tribal members, help with the application process, and recommend students for placement in the program. Statement of Facts, ¶ 9. Natural family interviews, a part of the application process, were conducted on the Navajo Nation Statement of Facts, ¶ 42. Furthermore, placement decisions were within the boundaries of the Navajo Nation. Caseworkers traveled to the Navajo Nation to interview students to determine where and with whom the student would be placed. Statement of Facts, ¶ 49.

Additionally, LDS leaders, including the branch presidents, would serve as intermediaries between program personnel, Navajo Nation personnel, and the parents of the participating children. Statement of Facts, ¶ 11. Caseworkers for the students would visit their families throughout the school year and summer, acting as a communication intermediary between the students and their natural families. Statement of Facts, ¶ 15. Even Harold Brown, who served as Commissioner of Petitioner LDS Family Services front 1976-1981 and 1985-1996 visited the Navajo Nation eight to ten times to visit with student families, church leaders, and tribal personnel. Statement of Facts, ¶ 14.

Plaintiffs not only had individual agreements with tribal families to enroll children in the Placement Program, but they also had large scale agreements between themselves and the Navajo Nation setting parameters for the Placement Program and allowing missionaries and churches within the boundaries of the Navajo Nation. This information directly bears on the jurisdictional analysis.

The Plaintiffs, in engaging in the above outlined activities within the Navajo Nation, agreed to provide a safe environment for the child participants of the Placement Program. As such, they had a duty to properly care for children while they were enrolled in the program, as well as a duty to report instances of child abuse to the participants' families, with whom representatives for Plaintiffs personally visited on the Navajo Nation throughout the duration of the program. The Plaintiffs' failure to disclose and warn the families of Plaintiffs about the child abuse they were suffering is directly connected to the Plaintiffs' actions within the Navajo Nation.

Plaintiffs claim they did not perform any placement decision activities within the Navajo Nation and that no actionable conduct occurred within the territorial boundaries of the tribe. Yet, Harold Brown, represented, under oath, to the contrary. Plaintiffs attempt to distinguish prior cases by emphasizing the requirement of actionable *conduct* occurring within the Navajo Nation, seemingly attempting to assert that tortious omissions are not "conduct" under *Montana*. However, as Judge Shelby of the United States District court for the District of Utah, Central Division explained, nowhere in *Montana* or its progeny is a distinction made between a tortious act and a tortious omission for purposes of jurisdiction analysis. Plaintiffs do not dispute that the sexual abuse itself occurred outside the Navajo Nation; nevertheless. Plaintiffs' asserted causes of action go beyond claims of sexual abuse. It is clear

there is a nexus between the causes of action alleged by the Plaintiffs and the actions taken by Plaintiffs within the tribe, giving this Court jurisdiction under the first exception of *Montana.*

V. **Plaintiffs Have Still Not Exhausted Tribal Remedies.**

Under the tribal exhaustion doctrine, the Federal Courts should abstain until a tribal court has had a "full" opportunity to determine its own jurisdiction *U.S. ex rel. Kishell v. Turtle Mountain Hous. Auth.*, 816 F.2d 1273, 1276 (8th Cir. 1987). As the United States Supreme Court has observed, "the orderly administration of justice in the federal court will be served by allowing **a full record** to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed." *Nat'l Farmers Union Ins. Companies v. Crow Tribe of Indians*, 471 U.S. 845, 856, 105 S. Ct. 2447, 2454, 85 L. Ed. 2d 818 (1985) (emphasis added).

The full record has not been developed in the tribal courts. Rather, the Navajo Supreme Court has ruled that the case should proceed to develop the record. As the Navajo Supreme Court determined in its opinion:

> Therefore, this Court finds that the Petitioners have failed to meet the burden to have the writ made permanent. Currently, the parties have not conducted discovery. The Petitioners have yet to file an answer. ***At this point, this Court lacks the facts necessary to make a dispositive assessment and must permit the trial court to proceed on the allegations in the complaint.*** To issue the writ prior to discovery, and without facts is to surrender sovereignty of the Navajo Nation.

*Corporation of the President of the Church of Jesus Christ of Latter-Day Saints, a Utah Corporation v. Window Rock District Court*, No. SC-CV-42-18, slip op. at 5 (Nav. Sup. Ct. December 28, 2018) (emphasis added).

Contrary to the assertions of the Plaintiffs, they have not exhausted tribal remedies, and this case should be dismissed until the tribal court has had a full opportunity to develop the record.

### VI. *The Navajo Courts Should Determine Whether This Case Has Settled.*

The United States Supreme Court has recognized that the Navajos have the sovereign right to make their own laws and be ruled by them. *Williams v. Lee*, 358 U.S. 217, 220, 79 S. Ct. 269, 271, 3 L. Ed. 2d 251 (1959). The Navajos have taken this sovereign right, and have extended it to examine carefully any purported effort to settle controversies in Navajo court. They have ruled that settlements will be approved when the Court sees that the interest of the party to be bound to the settlement was "manifestly" communicated. *Clark v. Allen*, 7 Nav. R. 422 (Nav. Sup. Ct. 1999).

Obviously, the Navajo courts recognize that a release or a settlement is a complete defense to a Navajo cause of action. Rule 8(c)(1)(A), Navajo Rules of Civil Procedure. However, no state or federal court in Utah should take the position of dictating to the Navajo people whether a "release" or "settlement" has occurred under Navajo law. This would only violate the Treaty of 1868 and the U.S. Supreme Court's decision in *Williams v. Lee*. It would also make no sense given the fact that Plaintiffs have not exhausted their tribal remedies. So long as the case rightly belongs in Navajo court, it is a Navajo court who should determine whether any settlement has occurred. *Merrion,* 455 U.S. at 149, n. 14 (finding that the tribe's sovereign power "remains intact").

Defendant intends to inform the Navajo court that she never agreed to settle this case. Her prior counsel conferred with her husband, who is not a party to this dispute, but not with her. Defendant

believes that Navajo court, indeed *any* court, who looks at this circumstance would find that she has not knowingly agreed to waive her right to sue.

This Court should follow the lead of the Second Circuit's opinion in *Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320 (2d Cir. 1997):

> This court has articulated four factors to guide the inquiry regarding whether parties intended to be bound by a settlement agreement in the absence of a document executed by both sides. *Winston,* 777 F.2d at 80. We must consider (1) whether there has been an express reservation of the right not to be bound in the absence of a signed writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing. *Id.* No single factor is decisive, but each provides significant guidance.

*Ciaramella*, 131 F.3d at 323.

All of these factors persuasively favor Defendant. Defendant is aware that Plaintiffs have settled several cases like this with other persons injured in the Placement Program. Defendant believes, and does allege, that all of these settlement agreements include language stating that the written document is the entirety of the agreement, and nothing was left to oral understanding. Moreover, there has been no part performance. Plaintiffs sent Defendant a check that she returned to them.

The Court should take judicial notice that this is the type of agreement that parties *always* get in writing. The idea that an oral agreement to settle in 2019 would be enough for sophisticated parties such as the Plaintiffs is patently absurd. Defendant did not sign such an agreement because she did not agree to settle her case. She did not agree to any terms with Plaintiffs. Even the agreement that Plaintiffs

22

believe they have, based on a conversation with Defendant's husband, only involves an agreement as to price. There is no agreement on any other terms, such as confidentiality, the scope of the release, etc.

Defendant believes that, when applying Navajo law, the Navajo courts, in exercise of their sovereignty, will find that she did not "manifest" her intent to settle under these facts. The point here is that *it should be the Navajo courts' decision to make.* Allowing Utah to dictate to the sovereign Navajo Nation whether or not a case pending in Tribal Courts has been settled would be a serious blow to tribal sovereignty.

## Conclusion

For the reasons stated above, this case should be dismissed.

DATED this 1st day of March, 2019.

DEISS LAW PC

/s/ *Wesley D. Felix*
Wesley D. Felix
Andrew G. Deiss
John Robinson

*Counsel for B.N.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of March, 2019, I caused to be served a copy of the forgoing

**MOTION TO DISMISS** upon all counsel of record via the Court's ECF system.

DEISS LAW
/s/ *Zach Abend*

23